**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| TOHONO O'ODHAM NATION, <br> *Plaintiff-Appellee,* <br><br> v. <br><br> CITY OF GLENDALE, <br> *Defendant,* <br><br> and <br><br> STATE OF ARIZONA, <br> *Defendant-Appellant.* | No. 11-16811 <br><br> D.C. No. <br> 2:11-cv-00279- <br> DGC |

| | |
|---|---|
| TOHONO O'ODHAM NATION, <br> *Plaintiff-Appellant,* <br><br> v. <br><br> STATE OF ARIZONA, <br> *Defendant-Appellee.* | No. 11-16833 <br><br> D.C. No. <br> 2:11-cv-00279- <br> DGC <br><br> OPINION |

Appeal from the United States District Court
for the District of Arizona
David G. Campbell, District Judge, Presiding

Argued and Submitted February 12, 2013
Submission Vacated June 21, 2013
Resubmitted October 30, 2015
San Francisco, California

Filed November 6, 2015

Before: DOROTHY W. NELSON, STEPHEN
REINHARDT, and MILAN D. SMITH, JR., Circuit
Judges.

Opinion by Judge Milan D. Smith, Jr.

---

## SUMMARY[*]

---

### Indian Law

The panel affirmed the district court's summary judgment in an action challenging the constitutionality of H.B. 2534, an Arizona law that allows a city or town within populous counties to annex certain surrounding, unincorporated lands.

The Tohono O'odham Nation purchased unincorporated land in Maricopa County, Arizona. The Nation alleged that H.B. 2534 was enacted in order to block the federal government from taking the land it purchased into trust on behalf of the Nation, a process that would render the land part of the Nation's reservation pursuant to the Gila Bend Indian Reservation Lands Replacement Act. H.B. 2534 was enacted

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

after the Nation announced its intention to build a casino on "Parcel 2" of the land, and after the Secretary of the Interior decided to take Parcel 2 into trust.

The panel affirmed the district court's holding that H.B. 2534 is preempted by the Gila Bend Indian Reservation Lands Replacement Act because it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of the Act—namely, to enable the Secretary to take Parcel 2 into trust and thereby incorporate the land into tribal land. The panel concluded that under H.B. 2534, the City of Glendale, Arizona, purportedly had the authority—at the point when the Nation filed a trust application—to preemptively annex unincorporated land and effectively block the trust application.

The panel thus affirmed the legality of the Secretary's taking of Parcel 2 into trust pursuant to the Act. It did not reach the Nation's other challenges to H.B. 2534.

---

## COUNSEL

Danielle Spinelli (argued), Seth P. Waxman, and Sonya Lebsack, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C.; Jonathan L. Jantzen and Laura Berglan, Tohono O'odham Nation Office of the Attorney General, Sells, Arizona, for Plaintiff-Appellee / Cross-Appellant.

Evan F. Hiller (argued) and Michael Tryon, Arizona Office of the Attorney General, Phoenix, Arizona, for Defendant-Appellant State of Arizona / Cross-Appellee.

Audrey E. Moog (argued), Hogan Lovells US, LLP, Washington, D.C., for Defendant City of Glendale.

## OPINION

M. SMITH, Circuit Judge:

This appeal involves a dispute concerning 135 acres of unincorporated land within Maricopa County, Arizona that was purchased by Plaintiff, the Tohono O'odham Nation (the Nation). The Nation filed suit against the City of Glendale and the State of Arizona (collectively, Defendants), challenging the constitutionality of H.B. 2534, a law passed by the Arizona legislature that allows a city or town within populous counties to annex certain surrounding, unincorporated lands.

The Nation alleges that H.B. 2534 was enacted to block the federal government from taking the 135 acres it purchased into trust on behalf of the Nation—a process that would render the land part of the Nation's reservation pursuant to the Gila Bend Indian Reservation Lands Replacement Act, Pub. L. No. 99-503, 100 Stat. 1798 (1986) (the Act). The Nation asserts that H.B. 2534 is preempted by the Act, violates the Equal Protection and Due Process Clauses of the U.S. and Arizona Constitutions, and violates the Arizona Constitution's prohibition against special legislation. The parties filed cross summary judgment motions. The district court ruled in favor of the Nation as to the federal preemption

claim, and ruled in favor of Defendants as to the remaining claims.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.  Tribal Land

The Tohono O'odham Nation, formerly known as the Papago Tribe, is a federally recognized Indian tribe with over 28,000 members.  The tribe is descended from Native Americans who resided for centuries along the banks of the Gila River in Arizona.  In 1882, by executive order, President Chester A. Arthur set aside for the Nation a 22,400-acre Gila Bend Reservation in southwestern Arizona.  The size of the reservation was later reduced to 10,297 acres by executive order of President William Howard Taft.  In 1960, in order to provide flood protection to non-tribal areas, the federal government completed construction of the Painted Rock Dam, located on the Gila River approximately ten miles from the Gila Bend Reservation.  In subsequent decades, flooding from the dam caused major damage to the reservation, destroying farm land and rendering the reservation land economically unviable.  The Nation was left with "a reservation which for all practical purposes [could not] be used to provide any kind of sustaining economy."  The Nation sought a legislative remedy, rather than engaging in lengthy litigation, and petitioned Congress for a new reservation on lands that would be suitable for agriculture.

### II.  Gila Bend Indian Reservation Lands Replacement Act

In 1982, pursuant to section 308 of the Southern Arizona Water Rights Settlement Act, Pub. L. No. 97-293, 96 Stat. 1261 (1982), Congress recognized its trust responsibility to

find a different land base for the Nation. Section 308 authorized the Secretary of the Interior (the Secretary) to conduct a study of the reservation, and to find lands suitable for a tribal reservation. The ensuing study concluded that the reservation land had little economic value and was unsuitable for agriculture or grazing. Another study found that there were no public lands within a 100-mile radius of the reservation that were suitable as potential exchange properties for the reservation.

In 1986, Congress passed the Act to facilitate the replacement of the reservation lands, and to promote the economic self-sufficiency of the Nation. Pub. L. No. 99-503, § 2. The Act (1) authorized the Nation to assign 9,880 acres of tribal land within the Gila Bend Indian Reservation to the federal government in exchange for $30,000,000; (2) authorized the Nation to purchase up to 9,880 acres of private land, which would, at the request of the Nation, be held in trust for the tribe, and thereby be incorporated into tribal land; and (3) released the Nation's claims against the United States for past injuries to land and water rights. Pub. L. No. 99-503, §§ 4(a), 6(c)-(d), 9(a). The Act requires that purchased private land be held in trust and not be "outside the counties of Maricopa, Pinal, and Pima, Arizona, or within the corporate limits of any city or town." *Id.* § 6(d). In 1987, the Nation assigned its rights in the reservation lands and relinquished its claims against the United States.

## III.    Acquisition of Land and Trust Application

In August 2003, the Nation purchased 135 acres of unincorporated land within Maricopa County, Arizona (the Replacement Lands) for $13.8 million. The Replacement Lands are wholly located in an unincorporated "county

TOHONO O'ODHAM NATION V. STATE OF ARIZONA     7

island," surrounded on all sides by land incorporated within the City of Glendale (the City), and include, among other properties, a 54-acre portion known as Parcel 2.

On January 28, 2009, the Nation filed an application with the Bureau of Indian Affairs, requesting that the Replacement Lands be taken into trust pursuant to the Act.  At the same time, the Nation publicly revealed its plan to build a casino on Parcel 2 of the Replacement Lands pursuant to the authority of the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721 (IGRA).  Pursuant to the IGRA, gaming activities may only take place on land that is part of an Indian reservation.  Thus, having at least some portion of the Replacement Land held in trust—which transforms the land into tribal land—is a precondition to the Nation's conducting gaming operations on that portion of the land.  On March 12, 2010, as a result of an ongoing state-court action, the Nation modified its application to request that only Parcel 2 of the Replacement Lands be taken into trust, and that the Department of the Interior hold in abeyance the rest of the Nation's application for the transfer of the Replacement Lands.

On July 23, 2010, the Secretary determined that Parcel 2 satisfied all the legal requirements of the Act, and that taking Parcel 2 into trust was mandatory.  The Secretary adopted the position that, under Arizona law, the Replacement Lands are not part of the City because they are not within the City's "corporate limits."  He expressly concluded that Parcel 2 is not "within the corporate limits of any city or town" based on the plain and jurisdictional meaning of "corporate limits" under the Act.  The Secretary also agreed that the trust application concerning the remaining portions of the Replacement Lands would be held in abeyance, pending a new request by the Nation.  The Secretary published notice of

his decision on August 26, 2010. 75 Fed. Reg. 52,550. He was then permitted to take Parcel 2 into trust 30 days after publication of notice of his decision. *See* 25 C.F.R. § 151.12(b).

## IV.    Opposition and Litigation

The Nation's trust application and subsequent plans to build a gaming casino on Parcel 2 have been vigorously opposed by Defendants, the Gila River Indian Community, and others.

Shortly after the Secretary's July 2010 decision, the City, the Gila River Indian Community, and others filed lawsuits against the Department of the Interior in the District of Arizona, challenging the Parcel 2 decision as a violation of the Administrative Procedure Act and the U.S. Constitution. The Nation subsequently intervened as a defendant, and the State of Arizona and various state legislators intervened as plaintiffs. The lawsuits were consolidated into one proceeding, denominated *Gila River Indian Community v. United States*, No. 10-cv-1993. In March 2011, the district court in *Gila River Indian Community* upheld the Secretary's decision and rejected statutory and constitutional challenges brought by the City, the State of Arizona, and others. The plaintiffs in that case appealed. The district court enjoined the United States from taking Parcel 2 into trust and enjoined the City from annexing Parcel 2 during the pendency of the appeal.

In an opinion issued on July 9, 2013, we affirmed the district court's decision in part and reversed in part. *See Gila River Indian Community v. United States*, 729 F.3d 1139 (9th Cir. 2013). We concluded that the phrase "within the

corporate limits" under section 6(d) of the Act was ambiguous, and we instructed that the matter be remanded to the Secretary to reconsider the phrase in light of the ambiguity we identified. *Id.* at 1147. Once our mandate issued, and the district court remanded *Gila River Indian Community v. United States* to the Secretary "consistent with the Ninth Circuit's opinion and mandate," it terminated the case, thereby dissolving its injunction.

On June 21, 2013, we vacated submission of the present appeal pending the Secretary's determination on remand. In response to our remand, on July 3, 2014, the Secretary reaffirmed that the phrase "within the corporate limits" has a jurisdictional rather than geographical meaning and was meant to describe "lands that have actually been incorporated by a municipality." Applying this definition, the Secretary determined that Parcel 2 was not "within the corporate limits" of the City and that "the legal requirements under the Act for acquiring Parcel 2 in trust have been satisfied." Consistent with the Secretary's ruling, the United States took Parcel 2 into trust for the Nation on July 7, 2014.

## V.  H.B. 2534

On February 1, 2011, while the district court proceedings in *Gila River Indian Community* were pending, the governor of Arizona signed H.B. 2534 into law. The bill was scheduled to take effect on July 20, 2011. A lead sponsor of H.B. 2534 stated that the bill was made necessary by a "power grab by the federal government," and that the legislature was "fighting an overreaching, intrusive Federal Government." The bill, codified at A.R.S. § 9-471.04, provides as follows:

A. Notwithstanding any other provision of this article:

1. A city or town located in a county with a population of more than three hundred fifty thousand persons may annex any territory within an area that is surrounded by the city or town or that is bordered by the city or town on at least three sides if the landowner has submitted a request to the federal government to take ownership of the territory or hold the territory in trust.

2. The annexation of territory pursuant to this section is valid if approved by a majority vote of the governing body of the city or town. The annexation becomes immediately operative if it is approved by at least two-thirds of the governing body of the city or town.

B. For the purposes of this section, "submitted a request to the federal government" means the landowner has made an application to the federal government as required by a specific federal statute or regulation.

A.R.S. § 9-471.04.

## VI.   Procedural History

Shortly after passage of H.B. 2534, the Nation filed suit against Defendants.  In the operative complaint, the Nation alleged that H.B. 2534 was specifically intended to frustrate the operation of the Act by permitting the City to annex the

Nation's land and bring it within the City's "corporate limits," thereby rendering that land ineligible to be taken into trust under the Act. The Nation alleges that H.B. 2534 is preempted by federal law, and is unconstitutional. In total, the Nation asserts six claims against Defendants: federal preemption (Count I); violation of the Due Process Clause under the U.S. and Arizona Constitutions (Counts II, V); violation of the Equal Protection Clause under the U.S. and Arizona Constitutions (Counts III, VI); and violation of the Arizona Constitution's prohibition on special legislation (Count IV).

The parties filed cross motions for summary judgment, which the district court granted in part and denied in part. Specifically, the district court ruled that H.B. 2534 directly conflicts with Congress' intent that the Nation's land be taken into trust pursuant to the Act, and is therefore preempted by the Act. The district court also determined that H.B. 2534 is preempted because it would cause the Nation to lose important voting and hearing opportunities that would otherwise be available under Arizona's general annexation law, A.R.S. § 9-471, thereby impermissibly burdening a federal right. The district court denied the Nation's due process claims because the Nation did not meet its burden of showing that H.B. 2534 is clearly arbitrary and unreasonable and unconnected to a legitimate state interest. It also denied the Nation's equal protection claims finding that H.B. 2534 survives the "very lenient" rational-basis inquiry. Finally, the district court held that the Nation has not shown beyond a reasonable doubt that H.B. 2534 constitutes special legislation.

On June 30, 2011, the district court entered judgment in favor of the Nation on its preemption claim, declaring that

H.B. 2534, as applied in this case, is preempted by the Act, and in favor of Defendants on the remaining claims.  The parties timely filed cross appeals, which were consolidated. The judgment of the district court was not stayed pending this appeal.

## STANDARD OF REVIEW AND JURISDICTION

"We review a district court's legal determinations, including constitutional rulings, de novo."  *Berger v. City of Seattle*, 569 F.3d 1029, 1035 (9th Cir. 2009) (en banc).  A district court's grant or denial of summary judgment is also reviewed de novo.  *Wright v. Incline Vill. Gen. Improvement Dist.*, 665 F.3d 1128, 1133 (9th Cir. 2011).

The district court may grant summary judgment on "each claim or defense – or the part of each claim or defense – on which summary judgment is sought."  Fed. R. Civ. P. 56(a). Summary judgment is proper where the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## ANALYSIS

Defendants challenge the district court's ruling that the Act preempts H.B. 2534.  Congress' power to preempt state law derives from the Supremacy Clause, which provides that the "Constitution, and the Laws of the United States . . . and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any

State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2; *see also Kurns v. R.R. Friction Products Corp*., 132 S. Ct. 1261, 1265 (2012) ("Pre-emption of state law . . . occurs through the direct operation of the Supremacy Clause." (quotation marks omitted)); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) ("A fundamental principle of the Constitution is that Congress has the power to preempt state law.").

There are three types of preemption: express, field, and conflict preemption. *Kurns*, 132 S. Ct. at 1265–66. Conflict preemption consists of impossibility and obstacle preemption. *Crosby*, 530 U.S. at 372–73. In this case, the Nation asserts obstacle preemption. Obstacle preemption arises when a challenged state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby*, 530 U.S. at 373 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

## A. Presumption Against Preemption

In conducting a preemption analysis, courts are guided by two bedrock principles: (1) the purpose of Congress, which is the "ultimate touchstone in every pre-emption case," and (2) "the assumption that the historic police powers of the States were not to be superseded by the [f]ederal [a]ct unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quotation marks omitted).[1]

---

[1] The Supreme Court in *United States v. Locke*, 529 U.S. 89 (2000), held that the presumption against preemption "is not triggered when the State regulates in an area where there has been a history of significant federal presence." *Id.* at 108. In *UFO Chuting of Hawaii, Inc. v. Smith*,

Following *Wyeth*, the district court concluded that the presumption against preemption applies and, as a result, the Act preempts H.B. 2534 only if preemption was "the clear and manifest purpose of Congress." *Wyeth*, 555 U.S. at 565 (quotation marks omitted). Although legislation related to Indian tribes is the exclusive province of Congress, H.B. 2534 implicates a city's authority to extend its corporate limits through annexation—an area of law historically subject to state regulation. *See, e.g.*, *Hussey v. City of Portland*, 64 F.3d 1260, 1263 (9th Cir. 1995) (citing *Hunter v. City of Pittsburgh*, 207 U.S. 161, 178–79 (1907)).

## B.  The Act Preempts H.B. 2534

Despite the presumption against preemption, the district court properly concluded that H.B. 2534 is preempted by the Act. "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects . . . ." *Crosby*, 530 U.S. at 373. As required by *Crosby* then, we proceed to examine the "purpose and intended effects" of the Act. The Act was passed in recognition of the federal government's trust responsibility to the Nation and to compensate it for the destruction of tribal land by flooding. The Act recognized that "[t]he lack of an appropriate land base severely retards the economic self-sufficiency of the O'odham people of the Gila Bend Indian Reservation, contributes to their high unemployment and acute health problems, and result in chronic high costs for Federal services and transfer payments." Pub. L. No. 99-503, § 2(3). As

---

508 F.3d 1189 (9th Cir. 2007), we distinguished *Locke* by limiting its holding to cases of field preemption, where "Congress leaves no room for state regulation." *Id.* at 1194–95.

eponymously expressed by the "Gila Bend Indian Reservation Lands Replacement Act," the Act was meant to "facilitate replacement of reservation lands with lands suitable for sustained economic use which is not principally farming and do not require Federal outlays for construction, and promote the economic self-sufficiency of the O'odham Indian people." *Id.* § 2(4).

Under the Act, replacement land is to be obtained by enabling the Nation to purchase private land that, under certain conditions, the Secretary is to hold in trust for the Nation. Pub. L. No. 99-503, § 6(c)-(d). The Act describes the mechanism and requirements by which the federal government is to take purchased land into trust and thereby incorporate the land into tribal land:

> The Secretary, at the request of the Tribe, shall hold in trust for the benefit of the Tribe any land which the Tribe acquires pursuant to subsection (c) which meets the requirements of this subsection. Any land which the Secretary holds in trust shall be deemed to be a Federal Indian Reservation for all purposes. Land does not meet the requirements of this subsection if it is outside the counties of Maricopa, Pinal, and Pima, Arizona, or within the corporate limits of any city or town. Land meets the requirements of this subsection only if it constitutes not more than three separate areas consisting of contiguous tracts, at least one of which areas shall be contiguous to San Lucy Village. The Secretary may waive the requirements set forth in the preceding

> sentence if he determines that additional areas
> are appropriate.

*Id.* § 6(d). Parsing this provision, several conditions must be satisfied before purchased land can be taken into trust by the Secretary. First, the phrase "at the request of the Tribe" indicates that the Nation must request that the Secretary take purchased land into trust. Second, the section imposes two limitations: (a) the purchased land cannot be "outside the counties of Maricopa, Pinal, and Pima" in Arizona, and (b) the purchased land cannot be "within the corporate limits of any city or town." Third, the purchased land must "constitute[] not more than three separate areas consisting of contiguous tracts, at least one of which areas shall be contiguous to San Lucy Village." Once these requirements are satisfied, the provision commands that the Secretary "shall" take the land into trust, and any such land "shall" be deemed to be tribal land. Thus, the Secretary's taking of eligible land is mandatory, not permissive.

Here, it is undisputed that the Nation purchased the 54 acres of land constituting Parcel 2 and, on January 28, 2009, filed a trust application with the Secretary. It is also undisputed that the Secretary issued a decision on July 23, 2010, concluding that Parcel 2 was not "within the corporate limits of any city or town," and that, having satisfied all the legal requirements under the Gila Bend Act, acquisition of the land into trust was mandatory. Following our remand in *Gila River Indian Community*, 729 F.3d 1139 (9th Cir. 2013), the Secretary has since reconsidered and reconfirmed the jurisdictional interpretation of the phrase "within the corporate limits." But for the stay imposed by the district court in *Gila River Indian Community* pending appeal of that

case, Parcel 2 could have been taken into trust after September 25, 2010.

H.B. 2534 was passed two years after the Secretary's decision was handed down.  H.B. 2534 clearly stands as an obstacle to the implementation of the Act because, "under the circumstances of [this] particular case," the effect of the state law is to thwart "the accomplishment and execution of the full purposes and objectives" of the Act—namely, to enable the Secretary to take Parcel 2 (and the remainder of the Replacement Lands) into trust and thereby incorporate the land into tribal land.  *Crosby*, 530 U.S. at 373 (quotation marks omitted).  Specifically, H.B. 2534 provides that "[a] city or town located in a county with a population of more than three hundred fifty thousand persons may annex any territory within an area that is surrounded by the city or town or that is bordered by the city or town on at least three sides if the landowner has submitted a request to the federal government to take ownership of the territory or hold the territory in trust." A.R.S. § 9-471.04.  This provision applies to the Replacement Lands because they are located within Maricopa County, which exceeds the population threshold of 350,000 people,[2] and are fully "surrounded" by lands incorporated by the City.  Moreover, H.B. 2534 authorizes the annexation of adjacent lands—*i.e.*, the placing of land within [the City's] corporate limits—upon the landowner's [the Nation's] request that the land be taken into trust.  This language in H.B. 2534 was triggered when the Nation requested that the Secretary take land purchased by the

---

[2]  According to the U.S. Census Bureau, the estimated population of Maricopa County in 2011 was over 3 million.  *See* U.S. Census Bureau, http://quickfacts.census.gov/qfd/states/04/04013.html (last visited Oct. 16, 2015).

18   Tohono O'odham Nation v. State of Arizona

Nation [Parcel 2] into trust. Pub. L. No. 99-503, § 6(d). H.B. 2534 further specifies that "'submitted a request to the federal government' means the landowner has made an application to the federal government as required by a specific federal statute or regulation." The Act is such a "specific federal statute." Accordingly, at the very moment the Nation files an application with the Secretary to take any of the Replacement Lands into trust, the City is permitted, pursuant to H.B. 2534, to annex the same land by either a majority vote of the governing body or by two-thirds vote of the governing body, in which case the annexation "becomes immediately operative." A.R.S § 9-471.04, § A.2.

It is abundantly clear that H.B. 2534 applies to the Nation's trust application to the Secretary, filed in January 2009, and would, if not preempted, enable the City to effectively veto any portion of that application not already brought to fruition. This is so because once the land is annexed, it would no longer be outside "the corporate limits" and therefore would be ineligible to be taken into trust. In this case, the Secretary has already determined that Parcel 2 fulfills the statutory requirements of the Act and must be taken into trust, and took Parcel 2 into trust once the district court's injunction in *Gila River Indian Community* was dissolved. The trust application for the remainder of the Replacement Lands has been held in abeyance, but if the Nation renews its application, the Secretary has an obligation to take it into trust, since it also satisfies the requirements under Section 6(d) of the Act. Unless preempted, H.B. 2534 would permit the City to bar the taking of any of the remaining Replacement Lands into trust by the federal government, thereby blocking the Nation's effort to find replacement land, all in direct contravention of the express purpose of the Act.

Defendants challenge the district court's preemption analysis primarily on the ground that the district court erroneously read a temporal freezing provision into Section 6(d) of the Act.  The district court interpreted the phrase "at the request of the Tribe" to mean that "when the Nation asks [the agency] to take land into trust *that is not at that time* within the corporate limits of any city or town, [the agency] has a mandatory obligation to take the land into trust provided the other requirements . . . are satisfied" (emphasis added). Section 6(d) does not specify a precise time at which the Secretary assesses whether the purchased land is or is not within corporate limits.  The point in time could be at the time of purchase, at the time the trust application is filed, or anytime after the application is filed but before a decision by the Secretary is issued.

However, we need not decide this issue, since it does not affect our preemption analysis.  Under H.B. 2534, the City purportedly has the authority—at the point when the Nation files a trust application—to preemptively annex unincorporated land and effectively block the trust application.  This directly bars the Nation's effort to incorporate purchased land into tribal land, regardless of the moment in time at which the Secretary decides whether the land is within corporate limits.  Under the circumstances of this case, H.B. 2534 stands as a clear and manifest obstacle to the purpose of the Act because it was enacted after the Nation's trust application was filed, and it uses that application itself to thwart the taking of purchased land into trust.  Accordingly, we hold that H.B. 2534 is preempted by the Act.

## CONCLUSION

We affirm the decision of the district court. Because we hold that H.B. 2534 is invalid based on federal preemption, we need not reach the remaining challenges to H.B. 2534. The legality of the Secretary's taking of Parcel 2 into trust pursuant to the Act is affirmed, and the Nation is free to petition the Secretary to have the remainder of the Replacement Lands taken into trust, pursuant to the Act.

**AFFIRMED.**